IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Might Be Hungover, LLC, d/b/a Elxr Holdings, LLC,<br><br>                                    Plaintiff,<br><br>vs.<br><br>Rodney Koch, David Matuschewski, TW International Investments, LTD., TW Diversified Holdings, LLC, TW Funds, Inc., Glomaco, LLC, Bottoms Up Brands, LLC, Michael Rose & Associates Strategic Consulting, Inc., and NewCo<br><br>                                    Defendants. | C/A NO.:      2:24-cv-05099-DCN<br><br><br>**COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |

**TO:  THE ABOVE NAMED- DEFENDANTS**

*COMES NOW, Plaintiffs Might Be Hungover, LLC, d/b/a Elxr Holdings, LLC* (together, Plaintiffs), by and through their counsel of record Brewer Law Firm, LLC, and Smith Debnam Narron Drake Saintsing & Myers, LLP; and hereby complain against Defendants, above named, as follows:

<u>**INTRODUCTION**</u>

1.      Plaintiffs Might Be Hungover, LLC, d/b/a Elxr Holdings (hereinafter "MBH/Elxr"), a South Carolina Limited Liability Company, were the owners and proprietors of a growing liquor and spirits company, which entered into a series of transactions with Defendants, whereby Defendants have either contractually agreed to provide, or to otherwise assist in providing, $10 million dollars in funding for Plaintiff, in exchange for shares in Plaintiff's company.

2.      Defendants have engaged in a scheme to defraud Plaintiffs, and/or Plaintiff's investors, and/or the bankruptcy court system, and to steal the corporate assets and opportunities of Plaintiff

1

Corporation MBH/Elxr, and to illicitly transfer, move, or assign those assets and/or opportunities to a new entity, while scheming to divert the $10 million TW Defendants contracted to fund Plaintiff with, to the entity now holding Plaintiff's corporate opportunities, while simultaneously coercing Plaintiff's principals to steer Plaintiff entity into bankruptcy so as to extinguish the claims of Plaintiff's creditors, investors, and lenders, while letting the corporate assets and opportunities of Plaintiff entity survive, in another corporate shell, without the burden of Plaintiff entities' debt..

3.      When Plaintiffs were introduced to Defendants, Defendants marketed themselves as experienced investors, consultants, and principals in funds that provided project financing.

4.      Prior to the acts and events underlying this suit, MBH/Elxr devised a confidential and proprietary business opportunity to expand its business model, which, consisted of manufacturing and distributing its initial product Sweetgrass Vodka, and then, expanding to acquire the rights to, and distribute, additional premium alcohol products and brands, under one proprietary umbrella label.

5.      Plaintiff MBH/Elxr's former CEO, David Matuschewski, formed contractual relationships between Defendants collectively as named, and/or through their alter-ego entities, as consultants to raise $10 Million Dollars in capital for MBH/Elxr, and/or as the source of capital funds for MBH/Elxr, in exchange for ownership interest in MBH/Elxr.

6.      As a result of these contractual agreements, the Koch and TW Fund Defendants contractually agreed to fund $10 Million Dollars to Plaintiff MBH/Elxr,

7.      Plaintiff incurred substantial debt, obligations, and increased overhead, in reliance on all Defendants' collective representations, that the $10 Million Dollars would be paid, and that, Plaintiff should increase it's short-term investor obligations and loans, and that Plaintiff should

increase its overhead expenditures for expansion plans, since the $10 Million Dollar investment would cover these obligations

8.      Despite contractual agreements and months of written and oral reassurance, Koch and TW Fund Defendants delayed providing the $10 million in capital.

9.      As a result of the delayed funding, Plaintiff defaulted on contractual obligations to repay investors and short-term lenders, and defaulted on contractual obligations to expand its alcohol brands, resulting in lawsuits against Plaintiff, and its COO Jarrod Swanger, threats of suit.

10.     After local media began running negative coverage of Plaintiff and Swanger's mounting financial and legal problems, all due to the delayed $10 million in funds that Koch and TW Fund Defendants had contracted to provide, Defendants collectively engaged in a scheme to defraud Plaintiff, and its short-term lenders and investors.

11.     Upon information and belief, the scheme is as follows:

    a.      Defendants collectively agreed and conspired for Koch and TW Funds to continue to withhold the $10 million in funds due to Plaintiff, so that the money can never be used to fund Plaintiff, so that Plaintiff can never repay its short-term lenders and investors;

    b.      Defendants would then surreptitiously agree to divert and co-opt Plaintiff's corporate opportunities (including Plaintiff's now defaulted contracts) and growth plans to a new, as yet un-named NewCo, which Defendants would all collectively have ownership in, under the guise that these business opportunities can be rekindled in a new package (the same people behind the company, now with $10 million in funds to spend, and without millions in debt that their prior company (Plaintiff) previously owed.

    c.      Defendants would then scheme, and collectively agreed to negotiate with Swanger (COO of Plaintiff) to remain with Plaintiff company as the sole member and executive officer, while Defendant Matuschewski withdrew from the Plaintiff Company, in order to continue Plaintiff's business plans with Defendants, but in the form of the new NewCo.

    d.      As part of the proposed deal to Swanger, Koch and TW Funds entities, acting on their own behalf, and on behalf of all Defendants, offered Swanger 20% of Koch and TW Funds ownership stake in the new and unnamed

corporate entity (which would be receiving the $10 Million Dollars owed to Plaintiff), so long as Swanger agreed to steer Plaintiff entity into Bankruptcy, thus wiping out all debt obligations of the Plaintiff entity, and wiping out any potential interest or claim on the $10 Million in Funds, so that the money could be re-directed to the new, unnamed corporate entities, of which Defendants would remain as shareholders of the new entity.

e.     In exchange for Swanger's cooperation in wiping out the short-term loan and investment obligations of Plaintiff MBH/Elxr, through Chapter 11, Koch and TW Fund Defendants expressly offered, in a series of recorded calls, to hold shares in trust for Swanger and his wife, equaling 20% of the ownership shares Koch and TW Fund would receive in the new entity (operated by Plaintiff's former CEO Matuschewski) once the $10 Million Dollar was invested in the new entity. Koch and TW Funds expressly told Swanger that these "shares" would be transferred to Swanger and his wife, "after the smoke clears" from the Bankruptcy filing.

12.     What is clear is that Defendants do not intend on funding Plaintiffs' project. Since contracting with Plaintiff, Defendants have invented a series of false excuses and delays with the anticipation that Plaintiff, its short-term lenders and other investors disappear through a game of attrition and/or bankruptcy filings. Because of Defendants' actions, Plaintiffs have sustained damages and are entitled to legal equitable remedies.

## **PARTIES**

13.     Plaintiff Might Be Hungover, LLC, d/b/a Elxr, LLC[1] (hereinafter "MBH/Elxr"), is a South Carolian Limited Liability Corporation, with its headquarters in Charleston, South Carolina[2], Jarrod Swanger, during all times relevant hereunder, was the COO of MBH, under CEO David Matuschewski.

---

[1] Might Be Hungover, LLC ("MBH"), a limited liability company does business under the name of Elxr Holdings, LLC.MBH, and "Elxr Holdings, LLC" are the same entity. Some corporate documents and agreements signed on behalf of MBH/Elxr, reference Elxr, LLC, which is only a reference to MBH.

[2] Might Be Hungover, LLC, is incorporated in both South Carolina and in Delaware. Both entities are in fact the same limited liability corporation, and/or are alter-egos of the same entity. The South Carolina entity was set up first in South Carolina. Matuschewski later set up the alter-ego incorporation of the South Carolina entity in Delaware, without dissolving the South Carolina entity. Upon information and belief, Matuschewski never transitioned the corporate nucleus operations of the LLC to Delaware, and the headquarters and corporate nucleus operations of Might Be Hungover were always maintained in South Carolina.

4

14.     Defendant David Matuschewski is a Canadian Citizen and was the CEO and member of Might Be Hungover, LLC, a South Carolina Corporation, thus, submitting himself to the jurisdiction of this Court.  Defendant R. Koch has expressly communicated with Plaintiff that R. Koch and his alter-ego entities, are still working with Matuschewski, and, in these communications, has implied that Matuschewski is working directly with the Koch Defendant Entities to usurp MBH/Elxr's corporate opportunities, assets, and contractual rights.

15.     Upon information and belief, Defendant Rodney Koch ("Koch") is an individual who is doing business in the State of South Carolina, South Carolina and who resides in either the State of South Carolina or Florida.

16.     Upon information and belief, Defendant TW International Investments Ltd. ("TW International"), is a Bahamian registered company conducting business in the State of South Carolina. Upon information and belief, TW International has no separate corporate existence from Koch and TW Defendants, and is an alter-ego for those entities.  Upon information and belief, Bottoms Up is underfunded, consists of the same ownership as the TW Defendants, does not abide by corporate formalities, has non-functioning officers or directors, does not maintain corporate records, and/or is simply a façade for Rodney Koch.

17.     Upon information and belief, Defendant TW Funds Inc. ("TW Funds"), d/b/a TW Group of Funds, is a British Virgin Islands registered company conducting business in the State of South Carolina.  Upon information and belief, TW Funds advertises on its website, that it is a parent entity to TW International Investments, LTD, and upon information and belief has no separate corporate existence from Koch and TW Defendants and is an alter-ego for those entities. Upon information and belief, Bottoms Up is underfunded, consists of the same ownership as the

TW Defendants, does not abide by corporate formalities, has non-functioning officers or directors, does not maintain corporate records, and/or is simply a façade for Rodney Koch.

18.     TW Diversified Holdings, LLC, is a limited liability company formed pursuant to the laws of the State of Florida, and which is doing business in South Carolina.  Upon information and belief, TW Diversified has no separate corporate existence from Koch and TW Defendants, and is an alter-ego for those entities.  Upon information and belief, Bottoms Up is underfunded, consists of the same ownership as the TW Defendants, does not abide by corporate formalities, has non-functioning officers or directors, does not maintain corporate records, and/or is simply a façade for Rodney Koch.

19.     Glomaco, LLC, is a Florida Limited Liability Company, that, upon information and belief, is holding the funds in question, and is either a principal of, or alter-ego of, TW Diversified Holdings, LLC.  The Florida Secretary of State shows that Glomaco is an alter-ego of TW Diversified Holdings and Koch Defendants.  Upon information and belief,

20.     Bottoms Up Brands, LLC, is a Nevada Limited Liability Corporation, managed by Amanda Koch, wife of Rodney Koch and is a proxy for the Koch/TW Defendants, and is intended to be a shell company to hold assets of Plaintiff, a South Carolina entity, illicitly obtained through the conspiracy of Defendants.  Upon information and belief, Bottoms Up Brands has no separate corporate existence from Koch and TW Defendants, and is an alter-ego for those entities.  Upon information and belief, Bottoms Up is underfunded, consists of the same ownership as the TW Defendants, does not abide by corporate formalities, has non-functioning officers or directors, does not maintain corporate records, and/or is simply a façade for Rodney Koch.

21. Upon information and belief, Defendant Michael Rose ("Rose") is an individual who was doing business in the State of South Carolina, South Carolina, the State of Florida, and Canada and resides in Florida and Canada.

22. Upon information and belief, Defendant Michael Rose & Associates Strategic Consulting Inc. ("MRA"), is a corporation in Dartmouth, Nova Scotia, and is doing business in South Carolina. Upon information and belief, Defendant Rose is the owner of MRA.

23. Upon information and belief, Rodney Koch is the majority shareholder of TW International, TW Diversified, and TW Funds (collectively, the TW Defendants).

24. Upon information and belief, Rose is a shareholder of TW Defendants.

25. Upon information and belief, Rose knows that KOCH is subject to the ASC Bar.

26. Upon information and belief, Rose and MRA are partners with and facilitators for the TW Defendants and Koch.

27. ROSE knows that the TW Defendants are not a hedge fund or any sort of legitimate operating fund. Rather, Rose is fully aware that the TW Defendants are sham companies that serve as both a front and an alter ego of, Koch, and Rose to operate Defendants' schemes.

28. As part of Defendants' scheme, Rose has promoted the TW Defendants on the homepage of MRA's current website.

29. The TW Defendants use MRA to layer their financial liability, and Rose operates the MRA website as a fraudulent platform for the TW, Koch, and Rose to operate their nefarious activities.

30. Defendants Rose, MRA, Glomaco, TW Funds, TW Diversified, TW International, Bottoms Up Brands, NewCo, and Koch, will all collectively be referred to as "Koch/TW Defendants".

31.     Upon information and belief, and for purposes of this lawsuit, it is believed that Defendant Matuschewski has resigned his position with MBH/Elxr, so that he and Koch/TW Defendants can form a new entity to usurp and convert the corporate opportunities of MBH/Elxr, to a new entity, while leaving MBH/Elxr with only the liabilities, creditor claims, and lawsuits.

32.     Upon information and belief, NewCo is an unidentified corporation, and/or company, which has been secretly incorporated, or will be secretly incorporated

## JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over this matter because this action is predicated on diversity of citizenship under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

34.     This Court has personal jurisdiction over this matter because Plaintiff reside in South Carolina; and all of the Defendants maintain continuous and systematic contacts with South Carolina, and/or engaged in specific acts underlying this controversy occurred in South Carolina, such as to incur specific jurisdiction within the State of South Carolina.

35.     Venue is proper because (i) certain of the Defendants reside, conspired, and operated a scheme to defraud Plaintiffs in Charleston, South Carolina; and (ii) certain of the Defendants conspired to obtain assets and corporate opportunities of Plaintiff, a South Carolina Corporation, and contracted to acquire the shares of Plaintiff, a South Carolina corporation, and committed other tortious acts in Charleston County, South Carolina.

## FACTUAL BACKGROUND

36.     Prior to the events underlying this lawsuit, MBH/Elxr, had developed a confidential and proprietary business plan to expand its liquor branding and distribution business.

37. On or about May 3, 2023, MBH/Elxr entered into a stock purchase agreement with Niagara Falls Craft Distillers, Inc.

38. On or about December 5, 2023, MBH/Elxr entered into a share purchase agreement with an entity going by the name Blue Lobster, for the purchase of Nova Scotia Spirit Co.

39. On or about December 8, 2023, MRA/Rose proposed to MBH/Elxr, that MRA/Rose's "partnered private institutional investor . . . TW Funds" and Rodney Koch, and that MRA/Rose, TW Funds/Koch would invest $5 million dollars with MBH/Elxr, in exchange for an equity offering in MBH/Elxr.



40. On or about the dates of December 14, 2023, through December 18, 2023, MBH/Elxr entered into several agreements and amendments with Alex Partners, LLC, a consulting

firm, to pay MRA/Rose in equity shares of Plaintiff, in exchange for the promised funding by TW

Funds.  Pursuant to the second amended consulting agreement with Alex Partners, LLC:

> Alex Partners, LLC has introduced ELXR Holdings, LLC to Michael Rose & Associates (MR&A).  MR&A coordinates and formats ELXR's investment opportunity which is needed by MR&A's partnered private institutional clients.  If any of MR&A's clients, in particular TW Funds, closes a business transaction with ELXR Holdings, LLC in the next 90 days the following will be paid.

41.     On or about December 19, 2023, Koch and the TW Defendants entered into a valid,

binding, enforceable agreement (titled "Equity Purchase") with MBH/Elxr, to provide $10 Million

Dollars in investment funds to MBH/Elxr, in exchange for 20% equity in MBH/Elxr (valued at

$50 Million Dollars), and in further exchange for a 1% facilitation fee to be paid to Michael Rose

& Associates.  Core terms of the TW Equity Purchase includes the following:

> Dec 19, 2023
>
> Might Be Hungover LLC
> DBA Elxr Holdings
> 1640 Meeting Rd Unit 108
> Charleston, SC 29405
>
> RE: Equity Purchase
>
> C/O Mr. Jarod Swanger
>
> This letter is to confirm that we are prepared to make an investment as requested in the amount of $10,000,000 USD. The transaction of $10,000,000 will be available within 30 days after the client signs this term sheet and completes the engagement process with TW.
>
> The terms of the investment is as follows;
>
> 1. The term will be for a maximum of 60 months and the original investment of $10,000,000 must be paid back before the end of the 60 month period over a series of 4 structured payments or through an exit event.
>
> 2. There is no interest being charged on the investment, this is a structured equity share purchase for 20% of the company based on the agreed valuation of $50,000,000, our 20% will not be further diluted by the upcoming acquisitions as documented by the client.
>
> 3. TW will be placing the shares in an assigned company Bottoms Up Brands LLC, a dedicated holding company for beverage investments.

10

5. TW will be invoicing $83,400 USD to Might Be Hungover LLC, due in advance after the term sheet is signed and accepted for the risk mitigation insurance policy that TW will be placing to satisfy the allocation requirements for our Institutional Partner, Silverpoint Capital on this file. The payment will be paid to our US trust account at Glomaco.

6. The transaction of $10,000,000 will be paid into an approved trust account with the clients lawyer, funds will be disbursed following a final use of proceeds document for the targeted acquisition, inventory and operations. The client will receive reimbursable costs at closing for the insurance costs.

7. There will be a 1% facilitation fee which will be deducted at closing from the original investment proceeds and paid to Michael Rose & Associates.

5. This term sheet must be signed and returned within 48 hours of receipt or it will expire and be withdrawn.

Sincerely

*Rodney Koch*

Rodney Koch

Accepted

DocuSigned by:

*Jarrod Swanger*
56D50CD401764F6...

Jarod Swanger

12/19/2023

42.      MBH/Elxr timely accepted the agreement and all material terms of the $10 Million Dollar TW Equity Purchase into MBH/Elxr was perfected and fully ratified.  These $10 Million Dollars in funds represent a specific corporate asset and opportunity of MBH/Elxr.

43.      MBH/Elxr executed the TW Equity Purchase Agreement in South Carolina.  Just prior to the execution of the TW Equity Purchase Agreement, CEO David Matuschewski, gave power of attorney to Swanger to execute the Equity Purchase Agreement on behalf of MBH/Elxr. Swanger did so in South Carolina.

44.      On December 20, 2023, Glomaco, LLC, received on behalf of the Koch/TW Defendants the $83,400.00 in funds for the risk mitigation policy, paid on behalf of MBH/Elxr, and all contingencies were satisfied on the Equity Purchase Agreement.

11



45.     On or about December 20, 2023, MBH/Elxr communicated with Koch and TW Defendants about the need for short-term capital, and Koch/TW Defendants communicated that MBH/Elxr should proceed with procuring $500k in investments from short-term investors while waiting on the $10 Million Dollar TW Equity Purchase Funds.  MBH/Elxr expressly justifiably relied upon Koch/TW Defendants Equity Purchase Agreement, and material representations that the $10 Million in funds would be used to repay these short-term investors.  One example of such short-term investments is the below reference to the "Legacy" investor.



46.    Immediately after the execution of the Equity Purchase Agreement, Koch/TW Defendants began asking MBH/Elxr for documents and agreements concerning Plaintiff's corporate opportunities.   Plaintiff prepared a Use of Proceeds of document divulging these opportunities, and what the $10 Million Dollar Equity Purchase monies would go toward.



| Use of Proceeds | | |
|---|---|---|
| Item # | Item Description | Amount |
| | Nova Scotia Spirit Co. Acquistion | $3,000,000 |
| | Vancouver producer/bottler acquisition | $1,350,000 |
| | Bradshaw Bourbon inventory build | $500,000 |
| | Sweet Grass Inventory build (Jeremy Renner) | $500,000 |
| | JRNY Inventory build(NHL Pronger Brothers) | $100,000 |
| | Virgil Kane inventory build | $100,000 |
| | Various brands national launch through RNDC | $200,000 |
| | Reimbursable to founder | $250,000 |
| | Barrel Program to season Bourbon and new celebrity brands | $2,000,000 |
| | | $- |
| | | $- |
| | Escrow for future acquisition or working capital for large new client | $2,000,000 |
| | | $- |
| | Total | $10,000,000 |

47.    Koch/TW Defendants used this Use of Proceeds document to request the specific contract documents and agreements containing the precise terms for these acquisition deals and agreements.   The specific contracts and agreements referenced in the Use of Proceeds constitute assets and/or corporate opportunities of MBH/Elxr.



48.     On December 22, 2023, in reliance upon the Equity Purchase Agreement for Defendants to provide $10 Million Dollars to Plaintiff, and with the direct encouragement of Koch/TW Defendants, Plaintiff entered into an agreement to purchase certain distillery assets (known as the G&W Distillery Assets) from Labatts Brewing Company for $1.8 Million Dollars. Plaintiff paid $200,000 (Canadian Dollars) as a non-refundable deposit, based on these representations.   The Labatts Contract represented an asset and/or corporate opportunity of MBH/Elxr.

49.     Beginning on January 2, 2024, Koch/TW Defendants began stalling on providing the $10 Million Dollars.  Koch texted Swanger, as COO for Plaintiff, that he was still connecting with Silverpoint (one of the alleged investors in TW), and that funding to the escrow would take place "tomorrow".



50.     After delaying, Koch/TW Defendants indicated, in a text prior to January 8, 2024, that the $10 Million Dollars would be funded by January 15, 2024.  The below text represented to

Plaintiff that it would be able to close its acquisition deals by the week of January 15, 2024. These representations proved to be false.



51.    Importantly, Koch/TW Defendants continued to represent to Plaintiff, in a text on or about January 9, 2024, that the $10 Million Dollars would be delivered by January 15, 2024, and, due to their large ownership stake in Plaintiff, Defendants began involving themselves in the management decisions of the Company, including locating potential new facilities in Utah for Plaintiff.



52.    By January 19, 2024, Koch/TW Defendants were in Breach of the 30 day obligation of the December 19, 2024, TW Equity Purchase Agreement ("The Transaction of $10,000,000 will be available within 30 days after the client signs this term sheet and completes the engagement process").

**In Connection With Koch/TW Defendants Breach Of The Equity Purchase Agreement, Defendants Collectively Engaged In A Series Of Fraudulent And Deceptive Acts And Misrepresentations**

53.    On January 19, 2024, Koch/TW Defendants changed their representation that the $10 Million would be delivered the week of January 15, 2024, but indicated that the money would be ready to on "Monday", January 22, 2024.  These representations proved to be false.



54.    On January 24, 2024, Plaintiff entered into a short-term loan for $100,000.00, at 12% interest, to be paid back by March 24, 2024, based on Koch/TW Defendants' representations that the $10 Million Dollars would be funded prior to this date.

55.     On January 29, 2024, Koch/TW Defendants delayed the $10 Million Dollars again, blaming the delay on a nebulous "redemption issue", but wanted to discuss they would hold their shares of Plaintiff in their alter-ego entity, Bottoms Up Brands, LLC.



56.     On February 1, 2024, Koch/TW Defendants indicated the $10 Million would be wired on February 2, 2024.  This was a false representation.



57.     On February 9, 2024, Koch/TW Defendants indicated the $10 Million indicated the funds would be wired to Defendants' escrow, "our escrow at Glomaco", on February 12, 2024.  This was a false representation.



58.     On February 11 and 12, 2024, Koch/TW Defendants indicated the $10 Million Dollars would go out the next day, and that Defendants' escrow Glomaco ("Carlos"), could send the money to fund the purchases on the Use of Proceeds and the Labatts deal, showing that Defendants' had direct knowledge that their funding was directly linked to financial obligations of Plaintiff.   This was a false representation.



59.     On or about March 5, 2024, entered into a short term loan of $90,000.00, plus interest accruing at $1500/day, based on Koch/TW Defendants' continued representations that the $10 Million Dollar Investment was coming.

60.    On or about March 7, 2024, as the Koch/TW Defendants continued to delay on providing the $10 Million Dollars to Plaintiffs, Plaintiff needed to reassure Labatts that Plaintiff would fulfill the G&W Distillery purchase.  Koch/TW Defendants offered to confirm to Labatts that the there were no further due diligence contingencies on the Equity Purchase Agreement and that the $10 Million would be forthcoming.  Rodney Koch emailed Plaintiff "Letter for Labatts", containing a letter titled, Deal Funding Memo.



61.    Rodney Koch, through his Florida entity, TW Diversified Holdings, LLC, reconfirmed that "TW Funds has successfully concluded its due diligence . . .Risk mitigation insurance and all items have been completed . . .Subsequent to a comprehensive assessment, we

are committed to providing funding to Elxr Holdings totaling $10,000,000 USD, through our dedicated holding company for beverage investments, Bottoms Up Brands, LLC".



TW DIVERSIFIED HOLDINGS LLC.

Deal Funding Memorandum

March 7, 2024
To: ELXR HOLDINGS

C/O  Jarrod Swanger
     David Matuschewski

We are pleased to inform you that TW Funds has successfully concluded its due diligence on Elxr Holdings. Risk mitigation insurance and all items have been completed.

Subsequent to a comprehensive assessment, we are committed to providing funding to Elxr Holdings totaling $10,000,000 USD, through our dedicated holding company for beverage investments, Bottoms Up Brands, LLC. We expect the first $2,000,000 to be released to you within the next week with an additional $3,000,000 the following week.

We look forward to a successful partnership with Elxr Holdings and remain available for any further discussions or clarifications.

Best regards,

Rodney Koch
Chief Investment Officer
TW Diversified Holdings LLC

62.    However, over the next month,  Plaintiff defaulted under all of its contracts to acquire other liquor brands and assets, Plaintiff lost hundreds of thousands of dollars in escrow money, and demands of creditors, lenders, and investors increased substantially, as the debts, loans, investor subscriptions, and expenditures Defendants had encouraged Plaintiff to make, in reliance on the $10 Million Dollar Equity Purchase, came due, past due, or defaulted, and all the while Defendants continued to withhold the contracted $10 Million Dollars.

63.    On or about April 15, 2024, Rodney Koch/TW Defendants participated in a phone call with Jameson Jenkins, a Consultant affiliated with Scott Wilfong and Alex Partners, LLC (who had a contractual right to 2 million shares of MBH/Elxr, through the Consultant contract with Alex Partners).  In this phone call, Koch/TW Defendants admitted that:

20

a.      Koch/TW Defendants were opening themselves up to lawsuits, subpoenas, and depositions, for failing to perform on the Equity Purchase Agreement;

b.      Upon being questioned whether Koch/TW Defendants were actually dealing with investors to provide the millions of dollars in funding, that if Plaintiff filed suit, Koch/TW Defendants would force Plaintiff to spend hundreds of thousands of dollars in attorneys fees, and then walk away from TW Defendant entities and their contractual obligations to Plaintiff, as retaliation.

64.      In this same April 15, 2024, phone call, consultant Scott Wilfong a Consultant with a claim to 10% of MBH/Elxr shares and a payment of $125,000, said as follows, in regard to the breach of contract and proximate causation of the damage to MBH/Elxr from Koch/TW Defendants' breaches and tortious acts:

a.      That the December 19, 2023, Equity Purchase Agreement, which he referred to as a commitment letter, was a binding deal that opened Koch/TW Defendants to a lawsuit by Plaintiff.

b.      "Jarrod [as COO of MBH/Elxr] is under the gun. He's got these two acquisitions they wanted to make, they might be gone. You know, his business is almost at a point now where it's a restart, right? You know, because he's trained everything and that they don't have the inventory they need."

c.      "We're [referring to MBH/Elxr, and Wilfong's pending equity shares in MBH/Elxr] borderline disaster"

d.      "Jarrod [as COO of MBH/Elxr] is at a point now where we're just defeated."

e.      "Everything they're [MBH/Elxr] is going through is fixable . . . as long as they get capital in the very near term."

65.      On or about May 9, 2024, continued delaying payment of the $10 Million Dollars, as they had for months at this point.  However, instead of discussing Silverpoint as a funding partner, the Defendants were now indicating Seqouia would be the funding party.



**<u>Defendants Breach, Deceit, Fraud, And Misrepresentations,</u>**
**<u>Morph Into A Theft Of Plaintiff's Corporate Opportunities</u>.**

66.    On June 21, 2024, the Post and Courier published an article on Sweet Grass Vodka and Jarrod Swanger (in actuality, these were suits against MBH/Elxr), detailing, among other things, claims by investors that MBH/Elxr had defaulted on more than $750,000.00 in loans.

67.    On or about June 24, 2024, MBH/Elxr CEO David Matuschewski and Alex Partners, LLC, Consultant Scott Wilfong called MBH/Elxr COO Jarrod Swanger to discuss the negative press from the Post and Courier article.  Matuschewski told Swanger to make a list of all the investors who needed to be paid back, because the $10 Million Dollars had come into Koch/TW Defendants and was being held in escrow by Glomaco.

68.    On or about June 29, 2024, the Post and Courier published a second article, detailing how the profits from Swanger's house sale were seized in connection with the investor suits related to MBH.

69.    On or about June 30, 2024, Swanger received a call from Plaintiff's consultant, Scott Wilfong, of Alex Partners, LLC.  Wilfong indicated to Swanger that Wilfong had been in

touch with Defendant Matuschewski and Koch/TW Defendants. Collectively, Wilfong, Matuschewski, and Koch/TW Defendants felt that there was too much bad press for the "new company", and that Matuschewski would reach out.

70.    On or about July 1, 2024, Plaintiff's CEO, Defendant Matuschewski, emailed Swanger and tendered his resignation from MBH/Elxr in an attached Word document. The email said, "Attached is my resignation letter. Please send an email back, confirming receipt. Rodney Koch will also be reaching out to you shortly." The resignation letter attached to Matuschewski's email read:

July 1st, 2024

Delivered via email

To Jarrod Swanger

This is my formal letter of resignation as an officer, manager and employee of Might Be Hungover, LLC DBA Elxr Holdings, LLC.

To take effect immediately.


David Matuschewski

71.    This was a significant turning point for Swanger, as COO of Plaintiff MBH/Elxr. Matuschewski was Swanger's partner and in MBH/Elxr, and the LLC's CEO. However, since June 24, 2024, at the peak of Plaintiff's worst financial and public relations crisis, Matuschewski had stopped communicating with Swanger by phone.

   a.    Matuschewski's July 1 email was devoid of any reason for his resignation of his membership interest in MBH/Elxr;

   b.    Matuschewski's communication made no effort to negotiate a buy-back of Matuschewski's 50% in MBH/Elxr;

   c.    On July 24, 2024, Wilfong mentioned that there was too much bad press for the "new company". Swanger assumed the "new company" meant MBH/Elxr, but Swanger began to realize that Wilfong's reference to a "new company", may have been a clear allusion to the fact that Matuschewski,

Koch/TW and other parties claiming ownership in MBH/Elxr, may be forming a new company holding the assets and corporate opportunities of MBH/Elxr, but without the debt, liabilities, and lawsuits, that associated with Might Be Hungover, LLC, d/b/a Elxr, LLC.

72.    On July 9, 2024, Rodney Koch, on behalf of Koch/TW Defendants, texted Swanger, as COO of MBH/Elxr, instructing Swanger to accept Matuschewski's resignation from MBH/Elxr. Specifically, Koch told Swanger the specific language that Swanger should use in accepting Matuschewski's resignation and offer to find a Charleston lawyer for MBH/Elxr.



73.    Swanger noted that it was odd that Matuschewski had stopped communicating with Swanger about the business of MBH/Elxr, when they were 50/50 partners, and when Matuschewski was the CEO. Swanger noted that it was even more strange that Koch knew about Matuschewski's resignation, and had an express interest in ensuring that MBH/Elxr accepted Matuschewski's resignation, in order "to eliminate [Matuschewski's] association or interests in all entities". This text, along with the preceding calls and communications from Koch, Wilfong, and Matuschewski (specifically the communications confirming that Koch and TW had secured $65

Million Dollars in funding [$10 Million for MBH/Elxr, and the remaining for other investments, such as Just Meats in Oregon], informed Swanger that Matuschewski, and Koch/TW Defendants were moving forward with the same business and business plan, using the assets and corporate opportunities of MBH/Elxr, but by placing these assets and corporate opportunities into a new company name, they would leave Swanger with no choice but to file bankruptcy in South Carolina for MBH/Elxr, and wipe out the debt and investors of MBH/Elxr.

74.    Swanger believes Matuschewski and Koch/TW Defendants plan is to deprive MBH/Elxr of the $10 Million Dollars in TW Equity Purchase, so that MBH/Elxr has no choice but to file bankruptcy.  That by Matuschewski resigning from MBH/Elxr, that Swanger is implicitly left to go down with the ship in South Carolina and steer MBH/Elxr into bankruptcy, and freeing Matuschewski from any liability associated with his ownership in MBH/Elxr.

75.    Upon information and belief, Matuschewski and Koch/TW Defendants believe that a Chapter 11 Bankruptcy filing by MBH/Elxr, will wipe out millions of dollars in liabilities, lawsuits, claims, and debts owed by MBH/Elxr to its other investors and short-term lenders.  When Matuschewski and Koch/TW Defendants create a new company/entity, they will fund the new entity with the $10 Million Dollars, originally contracted to MBH/Elxr, and then proceed to negotiate new contracts with Blue Lobster, Labatts, and Nova Scotia, to reacquire those liquor brands.  In effect, this would be the same company as MBH/Elxr, just with a new name, $10 Million in Equity, and no liabilities to pay, while MBH/Elxr would be dissolved in bankruptcy, and its debts to its creditors discharged.

76.    On that same day, following the instructions he was given by Koch/TW Defendants, Swanger wrote Matuschewski, accepting the resignation, as instructed.



77.     On July 11, 2024, after Koch called and texted Swanger to acknowledge that Swanger had done as he instructed, accepting Matuschewski's resignation.  Swanger then learned that Koch/TW Defendants, offered to make Swanger, individually, a part of the civil conspiracy agreement to defraud MBH/Elxr's investors through a sham bankruptcy filing.

78.     The sham bankruptcy would arise from Koch/TW Defendants, acting in concert with Matuschewski, deceptively and intentionally withholding the $10 Million Dollar funding from MBH/Elxr, so that it had no assets or funds with which to repay its creditors, investors, and lenders, forcing MBH/Elxr into bankruptcy, and discharging these debts.   In exchange, Koch/TW Defendants and Matuschewski would transfer to Swanger and his wife equity shares in the new, unnamed, NewCo designated to receive the $10 Million Dollar TW funds.

79.    Specifically, Koch/TW texted Swanger on July 11, 2024, to tell Swanger, to tell Plaintiff's bankruptcy lawyer , "we [Koch/TW and Matuschewski] will be holding some shares for you in TW to protect you, once he [ the bankruptcy attorney] wraps up Elixr and Sweetgrass through bankruptcy, we will transfer the shares to your trust.  I want him [the bankruptcy lawyer] to hold them with a pre-signed transfer agreement that just needs a date."



80.    Assuming Matuschewski & Koch/TW Defendants made good on their offer, Matuschewski & Koch/TW Defendants would place shares in the Newco entity in "trust" with an attorney, to be delivered to Swanger and his wife, after "the smoke clears", meaning, after the bankruptcy is complete and MBH/Elxr's creditors and debts are discharged.

81.    On July 25, 2024, Koch called Swanger.  Swanger recorded the call and has possession of the same.  In the call, Koch tells Swanger the following:

    a.    That Koch was setting up TW Diversified and separating it from TW International, "because the SEC has got me boxed in a little bit";

b.   Koch then asks Swanger, "I was hoping you got a chance to talk to your attorney [Plaintiff's bankruptcy attorney Campbell] yesterday";

c.   Swanger says, "I talked to him [bankruptcy lawyer] about your and my scenario, I said 'hey, *I got Rodney here and he wants us to shut down everything, make sure everything is clean and clear*", like me and you talked about last week; and then, '*he's got some shares in a custodial account*' or something like that, I don't know if I explained it right";

d.   To which Koch responds, "*know that I will be setting up for you guy's shares for you and your wife, but I'll do that after the fact, **once the smoke has cleared,** once you've been released from bankruptcy, that way you'll have those shares down the road*, but I want to place them with your attorney".

e.   Later in the call, Koch says, "yeah *we gotta make sure we got you into bankruptcy, cleaning up Sweetgrass, cleaning up Elxr, and all that kind of stuff, box that in*, then I'll gets some advice from Latham [referring to Los Angeles attorneys Latham & Watkins], soon as I know that's done and give me those documents [bankruptcy filing for MBH/Elxr] from your lawyer [bankruptcy lawyer] . . . and I'll share them with Latham, I'll drag you in on a call with them once we get those filings done".

82.   TW/Koch Defendants used the term "box in" to indicate that Defendants wish to keep the corporate opportunities of MBH/Elxr, under a new, un-named entity, titled NewCo in this suit, while boxing in the liabilities and debts to MBH/Elxr and discharging those debts through bankruptcy.

83.   On August 18, 2024, Koch calls Swanger again, and Swanger again recorded the call.  In the call, Koch tells Swanger the following:

a.   That Koch/TW Defendants had obtained $65,000,000.00 in funds intended for MBH/Elxr and an Oregon company called Just Meats [implicit in this conversation was the understanding that $10 Million Dollars of these funds, were the funds due MBH/Elxr, under the Equity Purchase Agreement];

b.   That TW is, "separating the fund from TW offshore", [implying that TW International will no longer be involved with the $10 Million Dollars, but that the money would be associated with a new US based company, likely TW Diversified];

c.  *That David* [Matuschewski] *is going and get that stuff moved* [implying the $10 Million Dollars] *and see where he takes this into as far as, you know, shares*" [implying that Matuschewski would use the $10 Million Dollars to fund the same deals and corporate opportunities that belonged to MBH/Elxr, but under a new company name with a new share structure];

d.  When Swanger tells Koch that Swanger is confused on bankruptcy [asking Koch/TW what kind of bankruptcy they wanted Swanger to file for MBH/Elxr], Koch says, "*You're not going to go through restructuring, you're going to go through a filed bankruptcy because you are not trying to restructure the Sweetgrass, you're not trying to restructure Elxr. You're trying to wrap those up because you know, basically, you've got too many shareholder loans out there showing shareholder investors out there that you can't pay back right now*, right, so we want you to go into a complete wrapping those up. You're not trying to recover. You're not trying to bring them back from the dead. You'll keep the brand obviously, Sweetgrass, if you can, so we could actually do something down the road, maybe, maybe not right. *But then, we want to make sure once you get those companies [shareholder loans and investors] away and you block those off, those shareholders that are attacking all the attacks, we have to stop that, right, that's what the bankruptcy does*. To get into a permanent bankruptcy, and then, what do you do from there? You're attorney will guide you best, because you're not looking to restructure, you're not looking to go back";

e.  Then Koch discusses the consideration for Swanger steering Plaintiff into bankruptcy, "*Then you want to be able to, I'm going to get some shares for you, and I'm going to hold those share for you and I'm going to give them to your attorney to hold in trust*, so he'll hold them, and ask him the best way to do it, because *I'm gonna keep them in TW's name because we don't want anyone attacking you guys for those*; *We're going to protect you and your wife; That's the whole goal of what we're doing here*."

f.  When Swanger asks Koch for details about the shares, Koch says, "you know you had 20% of the company before, right? So we had all these things. *So you're gonna wind up with 20% of the shares of TW Funds*. So whatever my side is . . .Let's say I wind up with a 60%, you're going to wind up with 12% of that 60%. *So you get 20% of whatever I get in this entity*."

g.  Then Koch says, "*We're going to take it and do it [referring to the $65 Million in TW Funds] and we're going to get you to the next calendar year to transfer. So we're going to get you past this bankruptcy stuff and transfer those shares back so you can actually liquidate those benefits or shares and distributions for you and your wife, right?* So you're going to get 20% of whatever TW gets in the deal";

h.      "So we can talk to your guy [bankruptcy attorney Campbell] together, and come up with a plan because it's about protecting you guys; ==*so no events have happened between TW and the Companies*== [upon information and belief, indicating Just Meats & MBH/Elxr, two companies that TW had contracted to provide funds to in exchange for ownership shares]; ==*yeah, so we've done nothing yet.  **Something will happen.  Yeah.  Into a different entity***==; and stuff like that.  And I want to be able to protect you.  <u>I just don't want that – this performance</u> [indicating the payment of the $10 Million Dollars to MBH/Elxr] *<u>tied to the bankruptcy in any way, shape, or form</u>*".

84.     On or about September 5, 2024, Koch texted Swanger, "*<u>Just checking in, I need the bankruptcy filing confirmation we spoke about so I can advance the file and separate the shares to protect you</u>*".    Upon information and belief, "advance the file" means to move the $10 Million Dollars in to the new, unencumbered entity and "separate the shares means issuing Swanger the new shares in the new entity, in exchange for the sham bankruptcy filing.



85.    When Swanger said that Plaintiff's bankruptcy attorney wanted to meet with creditors before filing, Koch said, "Just need the formal filing, he can work through the negotiations separately, but don't let him drive up legal costs".

## Defendants Have Been Previously Accused Of Illegal, Fraudulent Conduct And Business Activities

86.    Upon information and belief, in 2009, KOCH was investigated, charged, and ultimately suspended by the Alberta Securities Commission (ASC) for fraudulent and illicit activity. The findings and ruling of the ASC were adopted and enforced in the Provinces of British Columbia, Saskatchewan, Ontario, and Quebec.

87.    Specifically, on August 19, 2009, KOCH received a 25-year director-and-officer ban and was ordered to cease trading securities and was barred from using securities exemptions for 25- years (the ASC Bar) and was fined $225,000.00. Millions of dollars were illegally raised from the sale of securities under the direction and control of KOCH. Every investor witness that testified within the ASC proceedings stated that each had lost tens or hundreds of thousands of dollars and all had direct contact with KOCH.

88.    Koch/TW Defendants, including specifically, Rose/MRA, were recently named in another lawsuit[3], involving a similar set of facts, and were accused of setting up a methodical and deceptive process to bilk unknowing persons in the financial services market.  In this lawsuit, Koch/TW Defendants and Rose/MRA, were accused of entering into a fraudulent and illusory contract to provide hundreds of millions of dollars in investment funds to the Lucky Lake Farm, in exchange for Lucky Lake paying Koch/TW Defendants and Rose/MRA several million dollars in consulting and "insurance wrap" fees and payments.  Many of the same contracts, agreements,

---

[3] *Lucky Lake Farm & Water Limited Partnership v. Koch and TW Funds, TW International Investments, et. al.*, Case No. 2:23-cv-01768.

fees, and deceptive mechanisms listed in the Lucky Lake lawsuit, are present in the underlying transaction and occurrences of this suit.

89.    The Lucky Lakes lawsuit outlines a scheme of Koch/TW/MRA that bears similarity to the current scheme in the underlying facts and occurrences.  In the Lucky Lake suit, Lucky Lake alleges MRA advertised on its website that TW Group of Funds would use institutional partners such as Silver Point and Latham & Watkins, all entities Koch/TW Defendants name-dropped as participants in the underlying funding scheme.



90.    Upon information and belief, Jody Rookstool, of Just Meats, a Utah business, is currently experiencing an almost identical set of deceptive and fraudulent acts and misrepresentations by Koch/TW Defendants, over part of the total $65 Million Dollars in funding ($10 Million Dollars of which was pledged to MBH/Elxr).

91.    As a result of the Defendants' malfeasance and intentional, malicious conduct, the Plaintiffs were forced to hire attorneys to prosecute their claims herein.

**FOR A FIRST CAUSE OF ACTION**
**Declaratory Judgment – S.C. Code §15-53-10 and/or 28 U.S.C.S §2201 -**
**Piercing the Corporate Veil/Amalgamation of Corporations**
**(Against Rodney A. Koch, TW International Investments, Ltd., TW Diversified**
**Holdings, LLC, TW Funds, Inc. a/k/a TW Group of Funds, and Bottoms Up Brands, LLC)**

92.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

93.     There is an actual controversy, such that a Declaratory Judgment a Declaratory Judgment would resolve the issue as to whether the Defendants TW International Investments, Ltd., TW Diversified Holdings, LLC, TW Funds, Inc. a/k/a TW Group of Funds, and Bottoms Up Brands, LLC, are alter-egos of their primary share holder, Rodney Koch, and/or whether these Defendants are simply alter-egos of the same person or entity, under the amalgamation theory.

94.     Plaintiff has Article III standing to determine whether Koch and the various TW-related Defendants whom Plaintiff has transacted business with are really just alter-egos, or have disregarded the corporate form, of their various-related sibling entities.  Determination of the relationship of these TW related entities to Koch will be crucial in determining the appropriate relief for Plaintiff, and the dispute between the parties is substantial and immediate.

95.     In all communications, contracts, agreements, emails, and/or representations with Plaintiff, Rodney Koch interchangeably invokes TW International Investments, Ltd., TW Diversified Holdings, LLC, TW Funds, Inc. a/k/a TW Group of Funds, and Bottoms Up Brands, LLC, as entities that were contractually obligated to provide Plaintiff with the $10 Million Dollars in funds, to receive shares of Plaintiff in exchange for these funds, and which would provide Swanger and his wife with benefits for helping to accept David Matuschewksi's resignation from

33

Plaintiff and to steer Plaintiff into bankruptcy, thus, discharging Plaintiff's creditors, lenders, and investors' claims to the $10 Million Dollars in funds.

96.     Facts alleged in this Complaint establish that Koch and the TW Defendants are related to each other, and are used interchangeably by Koch/TW Defendants, showing a disregarding of the corporate form by Koch, who acts as the primary shareholder or officer acting variously on behalf of all entities.  Koch/TW's representations that the $10 Million Dollar funds, which is referred to generally as the TW Fund, may be placed in another entity, thus, underfunding the variously named TW Entities.  Further Plaintiff has alleged.  Further, the allegations against these same TW Defendants in the Lucky Lakes case, indicates that these facts and allegations are not limited to this transaction, but are a systemic misuse and abuse of the corporate form by Koch, through these entities.

97.     It would be inequitable to allow TW Defendant Entities to retain their strict corporate structure, as these entities are vehicles for Koch to engage in bad faith, abuse, fraud, or wrongdoing, and the corporate form should either be disregarded, and/or amalgamated, as best serves the interests of equity and justice.

98.     Plaintiff is entitled to Declaratory Relief that TW Defendants are simply facades and alter-egos of Koch and each other and that Plaintiff is entitled to an Order from the Court determining the same.

### FOR A SECOND CAUSE OF ACTION
### Unfair Trade Practices Act- SC Code §39-5-10, et. seq.
**(Against Rodney A. Koch, TW International Investments, Ltd., TW Diversified Holdings, LLC, TW Funds, Inc. a/k/a TW Group of Funds, and Bottoms Up Brands, LLC & Matuschewski)**

99.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

100.    Koch/TW Defendants made a series of false representations, regarding the availability and transfer of $10 Million Dollars in funds, after having received $83,400 Dollars in insurance wrap premiums and after Plaintiffs agreed to transfer 20% of its ownership shares to Koch/TW Defendants, at a value of $50,000.000.00.

101.    Moreover, Matuschewski and Koch/TW Defendants engaged in a series of deceptive acts in leveraging the failure to pay the $10 Million Dollars to Plaintiff, into a sham bankruptcy scheme, whereby these Defendants keep Plaintiff deprived of liquidity and assets to wipeout Plaintiff's liabilities to Plaintiff's creditors, lenders, and investors, all the while secreting Plaintiff's corporate assets and opportunities to the new NewCo, or entity, while simultaneously offering to secretly transfer shares of the new NewCo to Swanger, and holding those shares in a secret trust for Swanger, to protect the shares from bankruptcy, all in exchange for Swanger's cooperation in the scheme.

102.    These actions were intentional, deceptive and/or fraudulent, and are not only capable of repetition, but the allegations of Lucky Lakes against these same Koch/TW Defendants have been repeated with other unsuspecting companies.

103.    Defendants' false representations were made with the intent to fleece Plaintiffs out of at least money and corporate opportunities and assets, which has an adverse impact on the public interest.

104.    Matuschewski and Koch/TW Defendants' actions have proximately caused Plaintiff's actual damages in the loss of valuable contract assets, the siphoning of corporate assets and opportunities, the inability to repay millions of dollars in creditor, lender, and investor liabilities, and the loss of $10 Million Dollars in funds intended to help the growth of Plaintiff.

105.    As a result of these deceptive trade practices, Plaintiff is entitled to actual and consequential damages, treble damages and attorney's fees and costs.

**FOR A THIRD CAUSE OF ACTION**
**<u>Actual and Constructive Fraud</u>**
**(Against Rodney A. Koch, TW International Investments, Ltd., TW Diversified Holdings, LLC, TW Funds, Inc. a/k/a TW Group of Funds, and Bottoms Up Brands, LLC & Matuschewski)**

106.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

107.    Matuschewski and Koch/TW Defendants fraudulently and intentionally misrepresented facts, and deceptively withheld funding and usurped corporate assets and opportunities from Plaintiff, and secretly offered to hold secret shares of a new NewCo for Swanger, in order to induce Swanger to steer Plaintiff into a sham bankruptcy, in order to wipe out the liabilities of Plaintiff's creditors, lenders, and investors.

108.    Matuschewski and Koch/TW Defendants made the false representations that $10 Million Dollars in funds would be provided to Plaintiff, in order to induce Plaintiffs to incur further debts and obligations from creditors, lenders, and investors, and to induce Plaintiff to over-extend itself into further corporate opportunities and obligations, that these Defendants intended on usurping and converting from Plaintiff when the contracted and promised funds never arrived.

109.    Plaintiff relied on Defendants' representations, to its detriment, and without knowledge of the falsity of the same.

110.    Pled in the alternative, Defendants intended these false and deceptive representations, and/or, after first intending to provide the $10 Million Dollars, later decided to lean into withholding funds in order to exacerbate Plaintiff's financial distress and to turn the same into a corporate opportunity for these same Defendants, under the name of a new NewCo.

111.    Plaintiffs, at the time these representations were made and at the time Plaintiffs took the actions herein alleged, were ignorant of the falsity of Defendants' representations and believed them to be true.

112.    In reliance on these representations, Plaintiffs were induced to, and did, take all of the actions heretofore described.

113.    Had Plaintiffs known the actual facts, they would not have taken such actions, to include entering into the additional corporate investments, ramping up distruibutions, and taking on further debts, loans, and investments, that could not be repaid.

114.    Plaintiffs' reliance on Defendants' representations was justified.

115.    By making these fraudulent misrepresentations, Defendants caused damages to Plaintiffs, and Plaintiffs' reliance on the truth of the representations by Defendants were a proximate result and substantial factor in causing the harm to Plaintiffs.

116.    Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' fraudulent or intentional misrepresentations.

117.    As a direct and proximate result of Defendants' fraudulent or intentional misrepresentations, Plaintiffs have incurred damages, all in addition to the other damages as set forth herein, in an amount to be determined at the time of trial, but in excess of $75,000.

<u>**FOR A FOURTH CAUSE OF ACTION**</u>
<u>**Negligent Misrepresentation**</u>
**(Against Rodney A. Koch, TW International Investments, Ltd., TW Diversified Holdings, LLC, TW Funds, Inc. a/k/a TW Group of Funds, and Bottoms Up Brands, LLC & Matuschewski)**

118.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

119.    Defendants, in the course of an action in which they had a pecuniary interest, failed

to exercise reasonable care or competence in obtaining or communicating information to Plaintiff.

120.    Defendants misrepresented to Plaintiffs that the Defendants would provide the promised $10 Million Dollars in funds, and that Defendants would use information about corporate assets and opportunities for the benefit of Plaintiff, instead of

$883,500.00 Allocation Fee to purchase an Insurance Wrap for the benefit of Plaintiffs.

122.     Plaintiffs justifiably relied on Defendants' representations as presented and made by Defendants.

123.    Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' negligent misrepresentations.

124.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

**FOR A FIFTH CAUSE OF ACTION**
**Breach of Contract and Breach of Contract Accompanied by Fraud**
**(Against Rodney A. Koch, TW International Investments, Ltd., TW Diversified Holdings, LLC, TW Funds, Inc. a/k/a TW Group of Funds, and Bottoms Up Brands, LLC)**

125.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

126.    Plaintiff entered into a binding contract with Koch/TW Defendants to provide $10 Million Dollars in funds.  Valid consideration was paid on Plaintiff's behalf including $83,400 in insurance wrap premiums, 20% of Plaintiffs' shares, valued at $500,000.00.

127.    Koch/TW Defendants were required to provide said funds by January 19, 2024, and failed to do so, thus, breaching the contract and causing damages Plaintiff.

128.     In addition to the breach of contract, Koch/TW Defendants continued to withhold funds from Plaintiff, and continued the breach, telling repeated falsehoods to deceive Plaintiff that

the funds were coming, and encouraging Plaintiff to take on further debt and obligations, even when Koch/TW Defendants had secured said funds, and could have cured or remedied the same, all for the purpose of forcing/inducing Plaintiff to file bankruptcy so that Defendants could leverage Plaintiffs financial weakness to usurp and convert its corporate assets and opportunities into a new NewCo, all while forcing Plaintiff to discharge the debts and liabilities of Plaintiff in bankruptcy, as set forth in detail in prior paragraphs and allegations. In the instant case, Defendants held a confidential and fiduciary relationship with

129. By way of their actions, Defendants breached their legal and equitable duty to Plaintiffs by fraudulently deceiving Plaintiffs in direct violation of Plaintiffs' confidence, as well as misrepresenting and concealing material facts from Plaintiffs as alleged herein.

130. Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' Fraudulent acts in accompaniment of the breach of contract.

131. As a direct and proximate result of Defendants' constructive fraud, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

### FOR A SIXTH CAUSE OF ACTION
#### (Conversion)
**(Against Rodney A. Koch, TW International Investments, Ltd., TW Diversified Holdings, LLC, TW Funds, Inc. a/k/a TW Group of Funds, and Bottoms Up Brands, LLC & Matuschewski)**

132. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

133. With the help and participation of Matuschewski, Koch/TW Defendants used their inside position and position of trust and confidence to obtain confidential and proprietary information about Plaintiff's contracts, agreements, liabilities, and corporate opportunities, including the $10 Million Dollars, the contracts with Blue Lobster, Nova Scotia, and Labatts, and

to provide these assets to an unnamed NewCo, once Swanger is forced to push Plaintiff into bankruptcy, wiping out the debts and liabilities of Plaintiff's creditors, lenders, and investors.

134.     Defendants' conversion was in denial of, or inconsistent with, Plaintiffs' title or rights therein.

135.     Further, Defendants' conversation is in derogation, exclusion, or defiance of Plaintiffs' title or rights.

212.     Defendants have converted, and/or are in the process of converting Plaintiffs' corporate funds, assets, and/or opportunities to Defendants, constructively, actually, and/or to a NewCo.

136.     Defendants' conversion was intentional and deliberate and did cause the direct loss suffered by Plaintiffs in excess of $75,000.

137.     As a direct and proximate result of Defendants' conversion, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

138.     Plaintiffs have no other adequate remedy at law except a money judgment against Defendants, jointly and severally, in the amount fraudulently taken from Plaintiffs.

**FOR A SEVENTH CAUSE OF ACTION**
**(Civil Conspiracy)**
**(As to all Defendants)**

139.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

140.     Defendants, by acting in concert, intended to accomplish an unlawful objective for the purpose of harming Plaintiffs.

141.     Namely, Defendants, acting and in concert, fraudulently induced Plaintiffs into over-extending their liabilities and obligations, and intentionally and strategically withholding

contracted and agreed to financial assistance, in the form of $10 Million Dollars, and forcing Plaintiff into financial distress.

142.    When Koch/TW Defendants unilaterally failed to follow through with their promises representations, and contractual obligations, causing Plaintiff such severe financial distress that Defendants committed the tort of civil conspiracy. That is, the agreement between two or more persons to accomplish an unlawful purpose or to accomplish a lawful objective by unlawful means causing damages.

143.    Specifically, Matuschewski, Koch/TW Defendants, Glomaco, and Rose/MRA (collectively, "Conspiracy Defendants), all agreed to act in concert to commit the following series of torts or harms against Plaintiff:

a.    Once Plaintiff's financial difficulties were highlighted by the Post & Courier, in Charleston, South Carolina, Conspiracy Defendants agreed that Koch/TW Defendants would continue to withhold from Plaintiff the agreed to $10 Million Dollars in Funds (pursuant to the Equity Purchase Agreement, in order to force/leverage Plaintiff's financial difficulties into a full-blown need for Plaintiff to file bankruptcy;

b.    Conspiracy Defendants knew that David Matuschewski, as CEO of the Plaintiff, was the architect behind Plaintiff's proprietary, planned growth (Use of Proceeds, acquisition and expansion contracts of Labatts, Blue Lobster, Nova Scotia) and that, by transferring the $10 Million Dollars, contracted to Plaintiff, to a new NewCo, Matuschewski could use these monies to revive the asset purchase agreements and appropriate other corporate assets intended for Plaintiff;

c.    Upon information and belief, by cooperating in Matushcewksi and Koch/TW Defendants' scheme, MRA/Rose would give up their claim for ownership in Plaintiff, and instead make a claim for John Doe's shares, and massage the books and finances of NewCo, to satisfy the TW investors, while Glomaco and Bottoms Up Beverage, which are simply extensions of Koch/TW Defendants, would hold the funds in escrow, and out of Plaintiff's possession;

d.    Last but not least, in order to make this scheme and conspiracy work, Conspiracy not only sought to claim Plaintiff's corporate assets and opportunities as their own, but needed to cause special harm to Plaintiff by depriving it of money and assets to pay Plaintiff's debts and liabilities to its

creditors, lenders and investors.  Conspiracy Defendants agreed to do this in two ways:

i. First, Koch/TW Defendants worked on behalf of Matuschewski, whom Conspiracy Defendants needed to pull off the conspiracy, to be separated from Plaintiff and free from any claims and lawsuits surrounding Plaintiff.  In this regard, Koch/TW Defendants communicated with Swanger, Plaintiff's COO, on behalf of Matuschewski, and instructed Swanger on how to accept Matuschewski's resignation, in order to clear him of liability;

ii. Second, Conspiracy Defendants arranged for Koch/TW Defendants to induce Swanger, as the lone remaining officer of Plaintiff, to steer Plaintiff, and likely Swanger himself, into Chapter 11 Bankruptcy (while Conspiracy Defendants secretly usurped Plaintiffs' corporate opportunities and assets, leaving it with nothing).  As inducement to, an as consideration for, Swanger to file bankruptcy on behalf of Plaintiff, Koch/TW Defendants offered Swanger 20% of the TW Funds shares, to be held in trust and delivered to Swanger, once, "the smoke cleared" and Swanger had "boxed in" Plaintiff's creditors, lenders and investors into the bankruptcy lawsuit, discharging the debt and freeing Conspiracy Defendants to resuscitate the corpus of Plaintiff's business  in new NewCo.

144. The acts of Defendants, each acting out of self-interest, were intentional and deliberate and did cause the direct loss in excess of $75,000 by Plaintiffs.

145. Plaintiff have been detrimentally harmed and damaged as a result of Defendants' civil conspiracy.

146.  As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

## FOR AN EIGHTH SEVENTH CAUSE OF ACTION
**(Unjust Enrichment)**
**(As to all Defendants)**

147. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

148.    Defendants have unjustly retained Plaintiff's monies, corporate assets, and corporate opportunities, against fundamental principles of justice, equity, and good conscience, specifically by wrongfully inputting Plaintiffs' monies for personal gain and using the same to benefit another NewCo (and, thus, all Defendants), without the burden of Plaintiff's debt and liabilities to its creditors, lenders, and investors.

149.    As such, Defendants have been unjustly enriched.

150.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

### FOR A NINTH CAUSE OF ACTION
### (Constructive/Resulting Trust)
### (As to all Defendants)

151.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

152.    A confidential relationship exists between the parties.

153.    Through fraud, mistake, and/or other wrongful act, Defendants used Plaintiffs' Monies, corporate assets and opportunities, to steal, convert, and assign the same to the benefit of Defendants, and to the detriment of Plaintiff.  acquire personal and South Carolina real property with monetary personal property that lawfully belonged to Plaintiff.

154.    Defendants have taken, presently possess, and have wrongfully gained Plaintiffs' property, including but not limited to the $10 Million Dollars which is being held in trust and/or escrow by one of the named Defendants and/or their proxies.

155.    Plaintiffs are the rightful owners of the monies.

156.    A constructive/resulting  trust exists whereby Defendants presently holds legal title to the monies in those trust and/or escrow accounts, and whichmDefendants should hold title as trustee for the benefit of Plaintiffs.

157.    The retention of legal title by Defendants thereof against the Plaintiffs is inequitable.

158.    The existence of such a trust is essential to the effectuation of justice.

### FOR A TENTH CAUSE OF ACTION
**(Injunctive Relief as to All Defendants)**

159.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

160.    This lawsuit presents an actual case in controversy between the parties regarding more than $75,000.00 fraudulently taken from Plaintiffs.

161.    Federal Rules of Civil Procedure, Rule 65 permits a federal court to grant a preliminary injunction, and/or a permanent injunction upon a showing by the movant of substantial likelihood of success on the merits, that the movant will suffer irreparable injury without the injunction, that the injunction will not substantially injure others, and that the injunction furthers the public interest.  Plaintiff reserves the right to file a preliminary injunction when it learns through discovery the precise whereabouts of the funds.

162.    Defendants had no right, contractual or otherwise, to defraud the Plaintiffs out of excess of $75,000.00. This was simply a brazen act of fraud executed under the guise of an investment scheme. Defendants, with the assistance of others, were able to enrich themselves through a pattern of fraudulent and deceitful actions as set forth in this Complaint.

163.    Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' conduct.

44

164.    Plaintiffs request a preliminary and/or permanent injunction be entered freezing Defendants' assets given the facts and manner in which Defendants fraudulently fleeced monies from Plaintiffs through stealth and deception. There is a significant likelihood of success on the merits. If a preliminary injunction is not granted, Plaintiffs will suffer irreparable harm. The granting of an injunction will not harm any other parties. In light of the foregoing, the Court should grant a preliminary injunction freezing Defendants' assets due to the ongoing unlawful conduct of Defendants, as well as the likelihood of dissipating assets.

WHEREFORE, Plaintiffs pray for relief from this Court as follows:

1.    For a constructive trust;

2.    For injunctive relief freezing certain of the Defendants' assets;

3.    For damages in an amount in excess of $75,000 jointly and severally against all Defendants;

5.    For Treble Damages, attorneys' fees and costs as recoverable as incurred in this action;;

6.    For prejudgment interest on all sums found to be due and owing; and

7.    For such other and further relief as the Court may deem just and proper.

**BREWER LAW FIRM, LLC**

*/s/Barrett R. Brewer*

Barrett R. Brewer, Esq. .(Fed #8081)
Amanda F. Davis, Esq. (Fed. #13524)
P.O. Box 1847
510 Mill Street #2B (29464)
Mt. Pleasant, SC 29465
o: (843) 779-7454
f: (843) 779-7456
e: barrett@brewerlawfirmsc.com
e: amanda@brewerlawfirmsc.com
Attorneys for the Plaintiff


and

SMITH DEBNAM NARRON DRAKE
SAINTSING & MYERS, LLP

*/s/ J. Ronald Jones, Jr.*
J. Ronald Jones, Jr., (Dist. Ct. ID #5874)
171 Church Street, Suite 120C (29401)
P.O. Box 22795
Charleston, SC 29413
843) 714-2535 telephone
(843) 714-2541 fax
e: rjones@smithdebnamlaw.com